MENYUK, J.T.C.
This matter comes before the court on plaintiffs’ motion to reopen the judgment on the basis of newly discovered evidence. The motion is opposed on the ground that the plaintiffs had ample opportunity prior to trial to obtain the evidence that they now contend is new. For the following reasons, the motion is denied.
The subject property is a single family residence that was purchased new by the plaintiffs in 1995. The original assessment for tax year 2005 was:
Land $ 52,900
Improvements 92,900
Total $145,800
Plaintiffs appealed the assessment to the Burlington County Board of Taxation (the Board). Maple Shade Township (the Township) also filed an appeal of the assessment with the Board. The Board denied relief to the plaintiffs, issuing a judgment for the amount of the original assessment on June 17, 2005. The Board granted relief to the Township, issuing a second judgment on the same date, increasing the assessment as follows:
Land $ 60,000
Improvements 134,500
Total $194,500
By amended complaint, the plaintiffs appealed both judgments to the Tax Court and the matter was tried on January 24, 2006. The court’s file does not reflect any correspondence requesting an adjournment of the trial date. A judgment was issued by the Tax Court on January 31, 2006 affirming the second judgment of the Board.
Plaintiffs appealed the Tax Court judgment to the Superior Court, Appellate Division. While the appeal was pending there,the court granted plaintiffs’ unopposed motion to supplement the record to include a report dated May 19, 2006 from Geotech, Inc., an engineering firm that specializes in soils and foundations. Plaintiffs also sought to introduce several cost estimates from *303 various contractors to perform remediation work at the subject property. The Township subsequently filed a motion for reconsideration, which was granted, and by order of the Appellate Division entered on October 16, 2006, the case was remanded to the Tax Court to permit plaintiffs to seek relief from the judgment under R. 4:50-1 (b) (newly discovered evidence).
A motion for relief from a final judgment is “addressed to the sound discretion of the trial court and will not be disturbed unless that discretion has been clearly abused.” Quick Chek Food Stores v. Springfield Tp., 83 N.J. 438, 445-46, 416 A.2d 840 (1980). Both parties agree that, in order for relief to be granted on the ground of newly discovered evidence, the new evidence must (1) be material to the issue and not merely cumulative or impeaching; (2) have been discovered since the trial and must be such as by the exercise of due diligence could not have been discoverable prior to the expiration of the time for moving for a new trial; and (3) be of such a nature as to have been likely to have changed the result if a new trial had been granted. Pressler, Current N.J. Court Rules, comment 5.2 on R. 4:50-1 (2006), citing Quick Chek Food Stores, supra, 83 N.J. 438, 416 A.2d 840; Aiello v. Myzie, 88 N.J.Super. 187, 211 A.2d 380 (App.Div.), certif. denied, 45 N.J. 594, 214 A.2d 30 (1965); State v. Speare, 86 N.J. Super. 565, 207 A.2d 552 (App.Div.), certif. denied, 45 N.J. 589, 214 A.2d 28 (1965); Nieves v. Borran, 164 N.J.Super. 86, 395 A.2d 875 (App.Div.1978); Posta v. Chung-Loy, 306 N.J.Super. 182, 703 A.2d 368 (App.Div.1997), certif denied, 154 N.J. 609, 713 A.2d 500 (1998).
The Township concedes that the evidence plaintiffs seek is material, and that it is of a nature that could have changed the result. The Township opposes the motion, however, because plaintiffs were aware that there was a problem with the soil underlying their house, and had ample opportunity to obtain the evidence that they now seek to introduce, but failed to do so because of a lack of diligence.
It was plaintiffs’ contention at trial that their house had no value because of the settling of the soil on which it was built, and the consequent damage to the structure. Plaintiff Howard Bennett *304 testified that he believed that the land on which his home had been built had been filled in. In his words, the land had been used “to get rid of material, or road department debris, stuff like that, concrete.” Mr. Bennett testified that a year after his 1995 purchase of the home, he started seeing cracks in the foundation walls and settling around the house, particularly in the area of the family room. Mr. Bennett contacted the builder in 2004. The builder told him to make a claim under the homeowner’s warranty.
Edward Ryan, an engineer retained by the insurance company for determination of coverage under the warranty, inspected the house on January 3, 2005. Pursuant to a stipulation of the parties, the engineer’s report dated January 23, 2005 was admitted in evidence because the report served, in part, as the basis for plaintiffs’ testifying engineer. Among other things, Mr. Ryan’s report stated:
Based upon my observations as stated briefly herein, it appears that the Family Room at the north end of the subject dwelling is settling differentially due to debris-laden subsurface fill. Based upon the apparent age and presumed make-up of the fill, the differential settlement is likely a result of consolidation of originally uncompaeted fill, as well as degradation of putrescible matter within the fill.
John Hare testified as an expert engineer/architect on behalf of plaintiffs at trial and provided an opinion as to the structural stability of the home. Mr. Hare had inspected the property on May 9 and May 31, 2005. Mr. Hare’s report, dated June 6, 2005, was placed in evidence on stipulation of the parties. Mr. Hare incorporated a substantial portion of Mr. Ryan’s report in his report, and noted that he agreed with Mr. Ryan’s observations as to the cause of the differential settlement of the house.
Mr. Hare’s report concluded:
In order to affect repairs significant soil testing must be performed to determine the extent of the fill, soil characteristics, location of the buried top soil shear plane, etc., and then an actual repair method can be determined. At this point it is my professional opinion to a reasonable degree of architectural, engineering and professional certainty that the repair must include at a minimum include [sic] jacking and shoring of the family room super structure, removal of the basement concrete slab and concrete foundation wall, removal of the putrefiable debris and top soil, the installation of a new foundation wall down to solid suitable bearing [soil] and the installation of sheet piling or concrete slurry wall to prevent further sliding of the land mass.
*305 At this time it is my professional [opinion! to a reasonable degree of architectural, engineering and construction certainty that the cost of the above repairs mil be a minimum of $100,000 and could go above $250,000 and may exceed the entire value of the property.
At trial Mr. Hare stated that his estimation of costs to cure was made without the benefit of any soil testing, because he had to approximate something for purposes of the report.[2] On cross-examination, Mr. Bennett was asked whether or not anybody had performed soil testing or soil borings near the foundation of the house. Mr. Bennett responded that he was going to get a geotech to do that testing but that nothing had been done to date. Mr. Bennett confirmed that the estimates made by Mr. Hare for repairs had been done without the benefit of any soil testing.
Plaintiffs’ final witness was Joanna Rutter, a real estate appraiser, whose report was in evidence on stipulation of the parties. Ms. Rutter testified that she valued the property using a comparable sales approach and it was her opinion that the property would have a value of $265,000 without defects, but that she had relied on the engineers’ reports and her conversations with Mr. Bennett to reach an opinion that the property was unmarketable and therefore had no value.
The Township’s only witness was its assessor, Harry Renwick. Mr. Renwick stated that he had valued the property at $270,000, which was very close to the value of the unimpaired property reached by Ms. Rutter. Mr. Renwick testified that he did not agree with her final conclusion that the property had no value. He stated that he had asked Mr. Bennett to provide cost to cure figures which were never supplied to him.
After both parties had concluded their cases, I affirmed the judgment of the Burlington County Board of Taxation in a bench opinion. My decision rested on the principle that a presumption of correctness attaches to an original assessment. Pantasote Co. v. City of Passaic, 100 N.J. 408, 412-13, 495 A.2d 1308 *306 (1985). The same presumption is also accorded to a judgment of the county board of taxation. Byram Township v. Western World, Inc., 111 N.J. 222, 235, 544 A.2d 37 (1988). The taxpayer has the burden of proof and must produce sufficient competent evidence that is “definite, positive and certain in quality and quantity” to establish a valuation that is at variance with the assessment. Pantasote, supra, 100 N.J. at 413, 495 A.2d 1308, quotinq Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952).
Essentially, I rejected the plaintiffs’ appraiser’s opinion that the property had no value because it was unsupported by any market data and was, in effect, a net opinion.[3] I found that the plaintiffs’ appraiser’s opinion was not credible in light of the facts that the Bennett family continued to live there, and continued to improve the property, most recently with a new garage. In reaching her opinion, the appraiser relied on the report of Mr. Hare. As noted above, Mr. Hare had estimated that the cost to cure could be anywhere from $100,000 to an amount that would exceed the value of the property unimpaired. As he conceded, however, no soil borings had been done on the property. His estimate to cure the defects covered a broad range and in his words, he “had to approximate something” for his report.
I therefore concluded that there was a failure of proof: plaintiffs had not produced sufficient competent evidence that was “definite, positive and certain in quality and quantity” to overcome the presumption of correctness and to establish a true value for the subject property at variance with that set forth in the county board judgment. Ibid. While I believed that the defects testified to by Mr. Bennett and the engineer affected the value, the proofs regarding cost to cure were uncertain because no soil testing or borings had been done. I had no testimony from the appraiser as *307 to how the value of a house that would otherwise be worth $265,000 or $270,000 should be adjusted to account for the defects, apart from her unsupported testimony that the land and improvements together were worth nothing.
The evidence that plaintiffs now seek to produce consists of a report dated May 19, 2006 from Geoteeh, Inc. (Geotech), an engineering firm that had investigated the subsurface condition of the subject property for the purpose of determining the cause of the settling of the plaintiffs’ house. Geotech’s cover letter accompanying the report states that the work was done pursuant to a proposal dated January 27, 2006, or three days after the trial in this matter, and that it was authorized to begin the work by plaintiffs’ counsel on February 27, 2006. In general terms, the report concluded that the house (and not just the family room) had been constructed on land that had been filled with unsuitable materials. Geotech also noted that the slope at the north end of plaintiffs’ property was unstable and slipping toward the adjacent creek. In Geotech’s opinion, if the slope continued to slide, it would exacerbate the settling of the unstable fill under plaintiffs’ house.
To cure the defects, Geotech recommended that the entire superstructure of the house be removed and temporarily repositioned elsewhere. Following that, the underlying basement slab, walls and footings would be demolished and removed from the site. Next, the unsuitable fill would be removed in its entirety from the footprint of the house to a horizontal distance of at least twenty-five feet from the entire footprint of the house, or to the property line if that line was less than twenty-five feet from the house. The excavation would then be backfilled with suitable fill and compacted, at which point new footings, basement slab and walls could be constructed, and the house superstructure could be remounted. A retaining wall or a bulkhead would have to be built in order to stabilize the slope at the north end of the property. Geotech opined that further soil testing would be required before the precise cure for the slipping slope could be determined.
*308 In addition to the Geotech report, plaintiffs seek to introduce several cost estimates. Although some are undated, they all clearly respond to the recommendations made in the Geotech report. The first proposal, which is undated, is for the removal of the house from the foundation, excavation of the basement, removal and disposal of the bad soil, construction of a new basement, resetting the house on the new foundation, reconnection of utilities, and reinstallation of landscaping. The estimate is in the amount of $180,000. A second undated estimate for construction of a bulkhead was for $429,000 or $726,000, depending upon the materials used. An estimate dated August 4, 2006 for installation of a retaining wall and associated landscaping was in the amount of $219,685. A proposal dated August 8, 2006 to perform the entire remediation recommended by Geotech with respect to the house and the underlying soil (but not including the slope remediation) was in the amount of $309,505. A letter dated August 9, 2009 estimated $184,000 for a similar scope of work. At a minimum, it appears that the remediation recommended by Geo-tech will cost $400,000 (including remediation of the soil under the house at approximately $180,000 and construction of a retaining wall at approximately $220,000).
Plaintiffs’ motion is supported by the certification of Mr. Bennett, who states, “Once I knew the significance of the Ryan and Hare reports, I knew that I would have to have soil borings done on my property.” Mr. Bennett’s certification does not explain why he (or his attorney) did not arrange for soil borings until after the trial of this matter when the Ryan and Hare reports were written in January 2005 and June 2005, respectively (a year and more than six months before the trial). In fact, both reports were written before the plaintiffs filed their complaint with this court on July 26, 2005. Mr. Bennett conceded at trial that he knew that soil borings and tests would have to be made and that he intended to have that work performed at some point.
I conclude that the information that plaintiffs seek to introduce now, almost a full year after the trial, is information that could easily have been obtained well before trial. Although plaintiffs contend that they had no idea of the extent of the actual *309 condition of the soil underlying their home, the Ryan and Hare reports certainly indicated that further testing was required. Mr. Hare’s report specifically stated that “significant soil testing” would be necessary to determine a method to cure and an estimate of costs. The assessor, Mr. Renwiek, stated that he had repeatedly requested that information from the plaintiffs.
Plaintiffs argue that they were unable to obtain all of the evidence they now wish the court to consider because there is limited discovery for small claims cases in the Tax Court under R. 8:6-1 (a)(5), which provides:
In local property tax cases assigned to the Small Claims Division under the provisions of R. 8:11, discovery shall be limited to the property record card for the subject premises, inspection of the subject premises, a dosing statement if there has been a sale of the subject premises within three years of the assessing date, the cost of improvements within three years of the assessing date, and income, expense and lease information for income-producing property. The court in its discretion may grant additional discovery for good cause shown.
[emphasis added].
Neither plaintiffs nor the Township made a motion to expand the scope of discovery. In any event, it is apparent that plaintiffs would have been permitted to introduce such evidence at trial. The reports of Mr. Hare and Mr. Ryan far exceeded the scope of discovery under R. 8:6-1(a)(5), but those reports were provided to the Township and were placed in evidence on stipulation of the parties.
This case is remarkably similar to Posta v. Chung-Loy, supra, 306 N.J.Super. 182, 703 A.2d 368, a medical malpractice action in which the plaintiff had failed to produce any expert testimony on the issue of causation and summary judgment was granted to the defendants. Following trial on the remaining issues, the plaintiff moved for reconsideration of the summary judgment motion, based on newly discovered evidence, namely an expert report expressing an opinion as to causation of plaintiffs injuries. The Appellate Division stated:
R. 4:50-1, does however, make it clear that evidence justifying* relief is evidence that could not have been discovered by due diligence in time to move for a new trial. Plaintiff had three years to prepare for trial and twenty one days to obtain an expert to support his case. He failed to do so. Nevertheless, within two weeks after the case was dismissed, plaintiff obtained a report from Dr. Levinstone. We
*310 are satisfied that newly discovered evidence does not include a post-trial realization of the inaccuracy of medical proofs upon which the plaintiff relied at trial, and the attempt to remedy the same.
[Id. at 206, 703 A.2d 368],
See also Aiello v. Myzie, supra, 88 N.J.Super, at 195-98, 211 A.2d 380, where the newly discovered evidence consisted of an affidavit from plaintiffs testifying physician which stated that his earlier assessment of the plaintiffs condition was incorrect. The Appellate Division concluded that “[a] rule which would permit an added increment to a plaintiff in the event that his physician’s opinion as to his future progress turns out to be inaccurate would likewise call for a rebate to a defendant in the event that plaintiffs condition improved to a degree greater than estimated by the testifying physician.” Id. at 196, 211 A.2d 380.
In this case, plaintiffs had the Hare and Ryan reports before filing their complaint, and had six months to prepare for trial. Geotech’s proposal for the soil testing was made three days after the trial, and plaintiffs waited another month to authorize Geotech to perform the soil borings. It took Geotech about two and one half months to perform the tests and issue a report on May 19, 2006. Had this work been performed following the issuance of Mr. Hare’s June 6, 2005 report that stated such testing was necessary to arrive at any certain conclusions regarding remediation and costs, the Geotech report and associated estimates would have been ready in ample time for the January 13, 2006 trial. The court would certainly have considered a request for an adjournment of the trial date if such testing had actually begun and plaintiffs were awaiting a result. No requests for an adjournment were made.
The recently obtained evidence makes clear that plaintiffs’ property suffers from serious defects that will be costly to cure. It is worth mentioning, however, that by itself, this evidence is not sufficient to change the result of the original trial. It is not clear that the cost to cure should be deducted dollar for dollar from the unimpaired value of the property. As of the date of the trial, the plaintiffs and their children continued to live in the house, suggesting that the property had at least some value. There must be *311 credible testimony that relates the condition of the property to its market value. The failure of proof at the original trial was not only that there was a lack of certainty as to cost to cure, but also that the appraisal expert was not credible. When rendering her opinion that the property had no value, the appraiser did not relate the use of the property to value and offered no market data that the property had no value.
Each year’s local property tax assessment is a discrete event and each year must be separately appealed. N.J.S.A. 54:4-23; N.J.S.A. 54:3-21. Plaintiffs are not forever precluded from seeking a reduced assessment on the basis of the newly obtained evidence, but may introduce this evidence in any timely filed appeal for a year subsequent to the 2005 tax year at issue here. I conclude, however, that plaintiffs’ motion with respect to their appeal of the 2005 assessment must be denied because the information they seek to introduce could have been discovered prior to trial had due diligence been exercised.

 Mr. Hare's report appears to have been written in connection with the plaintiffs' home warranty claim, since the report contained a point by point refutation of a letter from the insurance company.

 The transcript suggests that I had some doubt as to whether the appraiser had established the value of the property unimpaired, since she had not testified on that point. There was no real issue of fact on the value of the property unimpaired. The plaintiffs’ appraiser's report in evidence and the Township's assessor's testimony both arrived at essentially the same value for the unimpaired property: $265,000 and $270,000.